FILED
2021 Apr-22  PM 03:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JEREMY JOSEPH NELSON,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  5:17-cv-08012-MHH** |
| | } | |
| | } | |
| **UNITED STATES OF AMERICA,** | | |
| | | |
| **Defendant.** | | |

### MEMORANDUM OPINION & ORDER

In 2015, Jeremy Joseph Nelson pleaded guilty to seven counts related to his creation, possession, and distribution of child pornography.  Now serving a 1,680-month sentence of imprisonment, Mr. Nelson, proceeding without an attorney, seeks relief from his sentence pursuant to 28 U.S.C. § 2255.  (Doc. 1).  Mr. Nelson contends that his attorney in his federal criminal case was ineffective.  This opinion partially resolves Mr. Nelson's § 2255 motion.

1

The opinion is organized in three sections.  In the first section, the Court identifies the procedural requirements for a § 2255 motion and the ineffective assistance of counsel standard that governs Mr. Nelson's motion.  In the second section, the Court describes Mr. Nelson's arrest, criminal proceedings, and § 2255 motion.  In the third section, the Court evaluates Mr. Nelson's ineffective assistance of counsel arguments, applying the governing legal standards

## I.

Criminal defendants do not have to bring an ineffective assistance of counsel claim on direct appeal before raising the claim in a motion made under 28 U.S.C. § 2255.  *Massaro v. U.S.*, 538 U.S. 500, 504 (2003) ("[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255 whether or not the petitioner could have raised the claim on direct appeal.").  Because collateral review is not a substitute for direct appeal, the grounds under § 2255 for collateral attack on final criminal judgments are limited.  A prisoner is entitled to relief under § 2255 if a district court imposed a sentence that violated the Constitution or laws of the United States, exceeded the court's jurisdiction, exceeded the maximum penalty authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255; *United States v. Phillips*, 225 F.3d 1198, 1199 (11th Cir. 2000); *United States v. Walker*, 198 F.3d 811, 813 n.5 (11th Cir. 1999).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of

other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (quoting *Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988)).  The "two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Holmes v. United States*, 876 F.2d 1545, 1551 (11th Cir. 1989) (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)); *see also Missouri v. Frye*, 566 U.S. 134, 143 (2012) ("The reality is that plea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages.").

Under the *Strickland* test, to establish ineffective assistance of counsel, a defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and that the defendant was prejudiced because "there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hill*, 474 U.S. at 57 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984)).  When challenging a guilty plea, a defendant establishes the "prejudice" prong of the *Strickland* test by showing "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59.

3

When "a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Counsel is "not ineffective for failing to raise a nonmeritorious claim." *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001). In evaluating the effectiveness or ineffectiveness of a defendant's attorney, a district court must consider the totality of the circumstances to determine whether the defendant had adequate representation. *Stanley v. Zant*, 697 F.2d 955, 962 (11th Cir. 1983). A criminal defendant is not entitled to the very best legal representation; adequate representation satisfies the constitutional standard. *Stone v. Dugger*, 837 F.2d 1477 (11th Cir. 1988).

If a defendant does not satisfy both prongs of the *Strickland* test, then a district court must deny the defendant's § 2255 motion. *Strickland*, 466 U.S. at 687. If a court decides that one prong has not been established, then the court does not have to reach the other prong. *Strickland*, 466 U.S. at 687; *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998).

## II.

Mr. Nelson's arrest and conviction stem from his production, possession, and distribution of child pornography.  In January 2014, the United States Department of Homeland Security and the Alabama Bureau of Investigation identified child pornography being shared between Mr. Nelson and an individual in Nashville, Tennessee.  (Crim. Doc. 17, p. 6, ¶ 12). [1]  Mr. Nelson was using the email account "dirtybird1972@gmail.com."   In one message to the Tennessee individual, Mr. Nelson wrote:  "I would like to trade with you if you are interested.  I am wondering if you have more of the three pics you posted.  Actually, I am interested in more than just those but that is all I am going to ask about this time.  In the meantime, here is a link for you to around 6,000 pics."  (Crim. Doc. 17, p. 6, ¶ 12).

On October 7, 2014, state and federal law enforcement officers visited Mr. Nelson's house in Huntsville, Alabama, and Mr. Nelson gave verbal and written statements admitting to producing child pornography.  (Crim. Doc. 17, p. 7, ¶ 13). Mr. Nelson told investigators that there was an extensive amount of child pornography on an external hard drive connected to his computer.  (Crim. Doc. 17, p. 7, ¶ 14).  He also stated that over a period of several years, he had been using

---

[1] These facts are set out in Mr. Nelson's Presentence Investigation Report.  (Crim. Doc. 17).  The Court adopted these facts without change during Mr. Nelson's sentencing hearing.  (Crim. Doc. 33, p. 6).  "Crim. Doc." refers to docket entries in Mr. Nelson's underlying criminal case, No. 5:14-cr-00372-MHH-JEO-1.

hidden cameras to record his daughter, his cousin's daughter, his former girlfriend's daughter, and a few of their underage friends in his home. (Crim. Doc. 17, p. 7, ¶ 15). These recordings depicted minors in various stages of undress in the bathroom. (Crim. Doc. 17, p. 7, ¶ 15). He told investigators he had used a digital clock containing a hidden camera to make his pornographic recordings. (Crim. Doc. 17, p. 8, ¶ 18).

Mr. Nelson indicated that he had placed hidden cameras in several Huntsville businesses. (Crim. Doc. 17, p. 7, ¶ 16). Some of the cameras Mr. Nelson built himself; others he ordered online. (Crim. Doc. 17, p. 7, ¶ 17). After Mr. Nelson told investigators about his activities, the investigators collected cameras, SD cards, thumb drives, computer disks, and computers from his home. (Crim. Doc. 17, p. 8, ¶ 19). Mr. Nelson also provided to investigators "yearbooks" from Anne's Dance Studio. (Crim. Doc. 17, p. 8, ¶ 19).

On November 25, 2014, a federal grand jury indicted Mr. Nelson on seven counts for the creation, possession, and distribution of child pornography. (Crim. Doc. 1). On February 18, 2015, Mr. Nelson, represented by an Assistant Federal Public Defender, pleaded guilty to the seven counts in the indictment: four counts of Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a), Counts I-IV; two counts of Possessing or Accessing With Intent to View Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), Counts V-VI; and one count of Distribution

of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2), Count VII.  (Crim. Doc. 10).

Mr. Nelson signed a written plea agreement which included an appeal waiver. (Crim Doc. 10).[2]  The Assistant Federal Public Defender represented Mr. Nelson during the February 18, 2015 change of plea hearing.  Based on his sworn answers to the Court during his change of plea hearing, the Court determined that Mr. Nelson was acting voluntarily, and the Court accepted Mr. Nelson's guilty plea.  (Crim. Doc. 32, pp. 25–26).

As the Court explained to Mr. Nelson during his plea hearing, (Doc. 32, pp. 12–15), the statutory maximum term of imprisonment for the crime of Sexual Exploitation of Children is 30 years per count, and the mandatory minimum is 15 years per count.  18 U.S.C. § 2251(e).  The statutory maximum term of imprisonment for the crime of Possessing or Accessing with Intent to View Child Pornography is 20 years per count.  18 U.S.C. § 2252A(b)(2).  The statutory maximum term of imprisonment for the crime of Distribution of Child Pornography is 20 years per count, and the mandatory minimum is five years per count.   18 U.S.C. § 2252A(b)(1).

---

[2] In the waiver provision, Mr. Nelson preserved his right to contest in an appeal or in a post-conviction motion a sentence above the applicable statutory maximum sentences, a sentence above the top of the guideline sentencing range determined by the Court at the time of sentencing, and a proceeding impacted by ineffective assistance of counsel.

Based on Mr. Nelson's total offense level and criminal history, the United States Probation Office calculated for him a guideline imprisonment range of life. (Crim. Doc. 17, p. 25, ¶ 140). The Probation Office calculated that Counts I through VII should run consecutively to each other to produce a total sentence of 2,160 months or 180 years. (Crim. Doc. 17, pp. 25–26, ¶ 140). The Court sentenced Mr. Nelson to a total of 1,680 months of incarceration: 360 months each as to Counts I through IV, to run consecutively, and 240 months each as to Counts V through VII, each term to run concurrently to each other but consecutive to Counts I through IV. (Crim. Doc. 19, p. 2).

On July 10, 2015, Mr. Nelson appealed the judgment in his case to the United States Court of Appeals for the Eleventh Circuit. (Crim. Doc. 22). On January 13, 2016, a panel of the Eleventh Circuit dismissed Mr. Nelson's appeal because Mr. Nelson's plea agreement contained a valid appeal waiver. (Crim. Doc. 35). Mr. Nelson allowed his time to seek a writ of certiorari to the Supreme Court of the United States to expire on April 13, 2016. *Murphy v. United States*, 634 F.3d 1303, 1307 (11th Cir. 2011) ("[W]hen a defendant does not appeal his conviction or sentence, the judgment of conviction becomes final when the time for seeking that review expires."); Rule 13.1, RULES OF THE SUPREME COURT ("[A] petition for a writ of certiorari to review a judgment in any case, civil or criminal . . . is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment.").

8

Mr. Nelson filed this § 2255 motion on April 3, 2017.  (Doc. 1).  Before responding, the United States contacted Michael T. Tewalt, the Assistant Federal Public Defender who represented Mr. Nelson through judgment, and requested an affidavit concerning Mr. Nelson's ineffective assistance of counsel claims.  (Doc. 5, p. 1).[3]  The Federal Public Defender requested a ruling from this Court on whether Mr. Nelson had waived attorney-client privilege with respect to confidential communications between Mr. Nelson and the Federal Public Defender's Office regarding his unsuccessful direct appeal to the Eleventh Circuit.  (Doc. 7).  The Federal Public Defender explained that while Mr. Nelson's § 2255 motion did not raise an ineffective assistance of counsel claim with respect to the direct appeal, the Federal Public Defender wanted to ensure it covered its bases if the Court liberally construed Mr. Nelson's claims as including a challenge to the Federal Public Defender's representation on direct appeal.  (Doc. 7, p. 2, ¶ 4).  Because Mr. Nelson's § 2255 motion, (Doc. 1), and brief in reply, (Doc. 15), do not challenge his representation on appeal, the Court finds Doc. 7 moot.

---

[3] Mr. Tewalt no longer works for the Federal Public Defender's Office.  (Doc. 12-1, p. 1).

## III.

In his § 2255 motion, Mr. Nelson contends that his trial counsel was ineffective for six reasons.  First, Mr. Nelson argues that his counsel "failed to make any effort whatsoever toward suppression of any statement, waiver, or evidence obtained by the police." (Doc. 1, p. 13).  Second, his attorney "failed to provide any defense whatsoever concerning Counts 1-4.  Counsel should have recognized that the prosecution could prove almost none of the elements of the crime." (Doc. 1, p. 15).  Third, his attorney "failed to ensure that the plea agreement was understood by [Mr. Nelson and] embodied equitable terms." (Doc. 1, p. 16).  Fourth, his attorney "failed to challenge the constitutionality of the statutes and sentencing guidelines." (Doc. 1, p. 18).  Fifth, his attorney "failed to ensure that [Mr. Nelson] received a copy of the presentence report (PSR) in a timely manner, nor was it ever seen by [Mr. Nelson] before sentencing." (Doc. 1, p. 19).  Finally, his attorney "failed to perform at an objective standard of reasonableness due to a conflict of interest." (Doc. 1, p. 20).  The Court addresses each claim in turn.

### *Suppression of Evidence*

Mr. Nelson argues that Mr. Tewalt should have challenged the voluntariness of his (Mr. Nelson's) *Miranda* waiver.  He asserts that he was incapacitated when he waived his rights because when law enforcement came to his house on October 7, 2014, he had injected insulin (which had "resulted in an extremely low blood sugar

level"), he was drunk, and he was sleep deprived.  (Doc. 1, pp. 13–14).  He says that his attorney "was ineffective for failing to realize this and fulfill his role as an advocate . . . ."  (Doc. 15, p. 20).

Mr. Nelson argues that "it would make no sense, 'strategically' or otherwise, for a defense attorney to forego a defense that had even a low chance of success, especially when so few (or no) other options are presenting themselves."  (Doc. 15, p. 15).  Mr. Nelson points out that "even if the suppression hearing failed, the issue [would have been] preserved for direct appeal."  (Doc. 15, p. 15).  Courts have held that failing to object to, or failing to move to suppress statements or evidence, can be prejudicial.  *See, e.g.*, *Rivera v. Thompson*, 879 F.3d 7, 17 (1st Cir. 2018) (counsel's failure to move to suppress defendant's un-Mirandized statements was unreasonable because contrary to "clearly established Federal law"); *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 377 (3d Cir. 2018) (counsel's failure to object to admitted statements was unreasonable because there was no strategic explanation for action); *Hendrix v. Palmer*, 893 F.3d 906, 922–23 (6th Cir. 2018) (counsel's failure to move to suppress clearly inadmissible statements unreasonable because no strategic benefit).

To establish that Mr. Tewalt's representation was deficient because he failed to move to suppress evidence gathered as a result of Mr. Nelson's statements to law enforcement, Mr. Nelson must demonstrate that his attorney was aware of the

suppression issue.   Mr. Nelson's attorney told the Court that he reviewed Mr. Nelson's "waiver of his Miranda rights prior to the seizure." (Crim. Doc. 32, p. 22, tpp. 13–14).   But Mr. Nelson's attorney did not explain why he did not try to challenge Mr. Nelson's *Miranda* waiver and the evidence law enforcement officers gathered because of Mr. Nelson's statements.   The record does not reflect what Mr. Nelson told his attorney about his incapacity on the day of his arrest.

The United States argues that Mr. Nelson's attorney acted strategically because moving to suppress the statements or evidence would have been frivolous. (Doc. 12, p. 8).   The government submits that before contacting Mr. Nelson in October 2014, "law enforcement had sufficient evidence that Mr. Nelson was guilty of numerous child pornography violations."   (Doc. 12, p. 8).   This included Mr. Nelson's "shared images of child pornography with another target of a criminal investigation in Nashville, Tennessee."   (Doc. 12, p. 8).

That may be true, but no evidence in the criminal record or in the § 2255 record demonstrates that the United States had grounds to charge Mr. Nelson for production of child pornography until investigators interviewed Mr. Nelson in October 2014.   The investigatory report prepared by federal investigators appended to the United States' response to Mr. Nelson's § 2255 motion states that Mr. Nelson's confession led them to the hidden cameras he had placed in businesses in Huntsville and resulted in the recovery of covert video cameras, electronic data

storage devices, computers, and more.  (Doc. 12-2, pp. 1–5).  Thus, it appears that the United States relied on Mr. Nelson's *Miranda* waiver and cooperation to develop evidence to prosecute Mr. Nelson for the crime of production of child pornography.

Because the record does not indicate whether Mr. Nelson and his attorney discussed Mr. Nelson's alleged incapacity to wave his rights or a motion to suppress the evidence gathered from Mr. Nelson's house and other locations in Huntsville, the Court will hold an evidentiary hearing to resolve this portion of Mr. Nelson's § 2255 motion.

### *Defense on Counts I-IV*

Mr. Nelson argues that Mr. Tewalt provided no defense with respect to Counts I through IV, and Mr. Tewalt "should have recognized that the prosecution could prove almost none of the elements of the crime."  (Doc. 15, p. 20).  As noted, in Counts I through IV, Mr. Nelson was charged with the crime of Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a).  The statute provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or

mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a). Mr. Nelson argues that "the only depictions that were produced were those of people changing clothes, and this does not satisfy the burden of proof placed upon the prosecution." (Doc. 1, p. 15). He contends that "there were no instructions given. No one was employed, used, persuaded, induced, enticed, or coerced in any way, to perform in any manner or to do any thing [*sic*]." (Doc. 15, p. 21). And because "[t]he focal point of the depiction is not on the genitalia or pubic area . . . there is . . . no support for a finding of lasciviousness." (Doc. 15, p. 22).

Mr. Nelson submits that when he brought this matter to Mr. Tewalt's attention, "counsel informed the petitioner that because the camera was placed in a bathroom, it was enticement, therefore the only option was to plead guilty. This is utter hogwash and yet one more tactic used by counsel to force a guilty plea." (Doc. 15, p. 21). But the Eleventh Circuit held in *U.S. v. Holmes* that "the statutory phrase 'lascivious exhibition of the genitals or pubic area' may include depictions of the 'otherwise innocent' conduct of a minor which are surreptitiously taken by an alleged producer and made lascivious based upon the actions of the producer, not the child." 814 F.3d 1246, 1251 (11th Cir. 2016). Mr. Holmes "contend[ed] the

14

images depict 'mere nudity,' making him at most a voyeur." *Holmes*, 814 F.3d at 1251.  The Eleventh Circuit disagreed, concluding that "depictions of otherwise innocent conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction." *Holmes*, 814 F.3d at 1251–52.  In deciding that secret bathroom recordings could be lascivious, the Eleventh Circuit noted that Mr. Holmes placed "the cameras in the bathroom where his stepdaughter was most likely to be videoed while nude" and that the camera angle demonstrated that Mr. Holmes's focus was on capturing images of the victim's pubic area.  *Holmes*, 814 F.3d at 1252.

Mr. Nelson's conduct mirrors the conduct that the Eleventh Circuit concluded constituted lascivious exhibition for the purposes of the child pornography statute.  Mr. Nelson's attorney reviewed the evidence that the United States seized in its investigation and reported that "Mr. Nelson had recorded thousands of hours of raw video footage from hidden cameras . . . ." (Doc. 12-1, pp. 3–4).  The factual basis for Mr. Nelson's plea agreement and the factual information in Mr. Nelson's PSR establishes that Mr. Nelson engaged in conduct that violated 18 U.S.C. § 2251(a).  (Crim. Doc. 10, pp. 4–11; Crim. Doc. 17, pp. 6–10).  Many of the videos that Mr. Nelson produced focused on the pubic areas of Mr. Nelson's victims.  (Crim. Doc. 17, p. 9, ¶ 22).

Based on the *Holmes* decision and the evidence on which the United States relied, Mr. Nelson's attorney was not ineffective for failing to argue that Mr. Nelson's conduct was video voyeurism and not child pornography because the argument was without merit. *Chandler*, 240 F.3d at 917. Therefore, the Court denies Mr. Nelson's motion on this ground.

### *Mr. Nelson's Plea Agreement*

Mr. Nelson argues that Mr. Tewalt failed to ensure that he (Mr. Nelson) understood his plea agreement and that the plea agreement was equitable.

In challenging his understanding of the plea agreement, Mr. Nelson argues that he only had 15 minutes to review the plea agreement, (Doc. 1, p. 16), and that "there was no possibility" that he "was afforded sufficient time to understand the plea agreement due to the fact that he had no training in law; there were many statutory elements to consider; counsel failed to adequately explain the elements of the crimes, offer any alternative . . .; and counsel refused to allow the petitioner to retain a copy of the plea agreement . . . ." (Doc. 15, p. 31). The record contradicts Mr. Nelson's arguments.

On January 26, 2015, Mr. Nelson and Mr. Tewalt signed a "Guilty Plea Advice of Rights Certification." (Crim. Doc. 9). Mr. Nelson initialed 44 paragraphs, certifying that he understood what would happen at the change of plea hearing, what substantive rights he would give up by pleading guilty, that the charges would again

be explained to him by the judge, that the judge would ensure he understood the possible penalties, and that the judge would not be bound by the plea agreement. (Crim. Doc. 9, pp. 1–4). Mr. Nelson signed the "Certification of Defendant" which states:

> I, Jeremy Joseph Nelson, hereby acknowledge that my attorney, whose name is signed to the attorney certification below, has explained to me, in detail each of the matters set out above.
>
> I also certify that I am satisfied with the representation my attorney has provided me, and that I have no complaints about any aspect of his or her representation of me.
>
> I further certify that I am not under the influence of any alcoholic beverage, intoxicating liquor, drugs, medication, or other substance that affected my ability to understand all of the matters set out above.
>
> Finally, I certify that I am entering my guilty plea(s) because I am in fact guilty, and I request that the court accept my plea(s).

(Crim. Doc. 9, pp. 4–5).

Mr. Nelson signed his 27-page plea agreement the same day. (Crim. Doc. 10). Mr. Nelson initialed each page and signed the agreement on pages 11, 17, and 26. (Crim. Doc. 10, pp. 11, 17, 26). The plea agreement identifies the maximum punishment for each count to which Mr. Nelson pleaded guilty, (Crim Doc. 10, pp. 2–3), the factual basis for the plea, (Crim. Doc. 10, pp. 4–11), the recommended sentence, (Crim. Doc. 10, pp. 11–16), Mr. Nelson's waiver of right to appeal and to post-conviction relief, (Crim. Doc. 10, pp. 16–17), an explanation of the United States Sentencing Guidelines, (Crim. Doc. 10, p. 17), an acknowledgement that the

agreement is not binding on the Court, (Crim. Doc. 10, p. 18), an acknowledgement that if Mr. Nelson moved to enter an *Alford* please or a plea of *nolo contendere*, the plea agreement would become null and void, (Crim. Doc. 10, p. 18), an acknowledgement that Mr. Nelson's subsequent conduct could relieve the United States of its obligation to be bound by the plea agreement, (Crim. Doc. 10, pp. 18–19), an acknowledgement that the plea agreement only binds the United States Attorney for this district, (Crim. Doc. 10, p. 19), an acknowledgement of the collection of financial obligations, (Crim. Doc. 10, p. 19), an acknowledgement that Mr. Nelson would have to register as a sex offender, (Crim. Doc. 10, pp. 24–25), and a provision stating that Mr. Nelson had "read and underst[ood] the provisions of this agreement." (Crim. Doc. 10, pp. 25–26).

During Mr. Nelson's February 18, 2015 change of plea hearing, the Court asked Mr. Nelson if he was able to read both the Guilty Plea Advice of Rights Certification and the plea agreement and discuss them with Mr. Tewalt. (Crim. Doc. 32, p. 9). Mr. Nelson answered in the affirmative. (Crim. Doc. 32, p. 9). The Court reviewed the Guilty Plea Advice of Rights Certification with Mr. Nelson and asked if he had initialed the numbered paragraphs and signed the document. (Crim. Doc. 32, pp. 10–11). Mr. Nelson answered "Yes, ma'am." (Crim. Doc. 32, p. 11). The Court reviewed the plea agreement with Mr. Nelson and asked him if he had initialed the blanks on each of the 27 pages and signed the agreement on pages 11, 17, and

26.  (Crim. Doc. 32, pp. 11–12).  Mr. Nelson answered in the affirmative.  (Crim. Doc. 32, pp. 11–12).

The Court then asked Mr. Nelson's attorney:  "[i]t's my understanding you also reviewed this plea agreement with Mr. Nelson on a number of occasions after the execution of the plea agreement, including today; is that correct?"  (Crim. Doc. 32, p. 12).  Mr. Nelson's attorney answered yes.  (Crim. Doc. 32, p. 12).  The Court reviewed the terms of the plea agreement.  When the Court asked Mr. Nelson if he understood the maximum penalty the Court could impose under each count, Mr. Nelson answered that he did.  (Crim. Doc. 32, pp. 12–15).

Mr. Nelson confirmed that the facts in the plea agreement were substantially correct, that he understood that the Court would use those facts as a basis for calculating a sentence, that he had a full opportunity to discuss the government's recommendation concerning sentencing with his counsel, and that the Court was not bound by the government's recommendation.  (Crim. Doc. 32, pp. 15–16).  The Court reviewed the waiver provision that Mr. Nelson signed, and Mr. Nelson acknowledged that he was voluntarily forfeiting his right to challenge on appeal the Court's decision about sentencing, with three limited exceptions.  (Crim. Doc. 32, p. 17).  Mr. Nelson confirmed that he understood the effects of the appeal waiver provision and had discussed them with his attorney.  (Crim. Doc. 32, pp. 17–18).

19

Finally, the Court explained to Mr. Nelson the constitutional rights that he would forfeit if he pleaded guilty:

> Mr. Nelson, as of right now, you have pled not guilty to the charges against you, and you have certain rights in light of that not guilty plea. You have the right to go to trial, and at trial the government would bear the burden of proof and you would be presumed not guilty. You would have the right to cross-examine any witnesses who the government calls. You would have the right to call your own witnesses. You would have the right to testify if you wanted to, but you couldn't be compelled to testify. You would have the right to be represented by an attorney throughout that trial. If the Court accepts a guilty plea from you in this matter, you will be giving up all of those rights. Have you had an adequate opportunity to discuss with Mr. Tewalt the rights that you will be giving up if the Court accepts a guilty plea from you in this matter?

(Crim. Doc. 32, p. 20).  Mr. Nelson answered in the affirmative.  (Crim. Doc. 32, p. 20).  Mr. Nelson indicated that he had an adequate opportunity to talk with his attorney about the terms of the plea agreement.  (Crim. Doc. 32, p. 21).  The Court noted the length of the plea agreement and asked Mr. Tewalt if he felt that he had enough time to discuss the agreement with Mr. Nelson.  (Crim. Doc. 32, p. 23).  Mr. Tewalt said he had.  (Crim. Doc. 32, p. 23).  The Court found that Mr. Nelson had acted voluntarily in changing his plea from "not guilty" to "guilty."  (Crim. Doc. 31, p. 25).

As the Eleventh Circuit had explained, "[t]here is a strong presumption that the statements made during the [plea] colloquy are true." *U.S. v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) (citing *United States v. Gonzalez-Mercado*, 808 F.2d 796, 800 n.8 (11th Cir. 1987)).  Mr. Nelson was 42 years old at his change of plea hearing.

(Crim. Doc. 32, p. 9).  He had graduated from high school and had some college education.  (Crim. Doc. 17, p. 3; Crim. Doc. 32, p. 9).  Mr. Tewalt described Mr. Nelson as "a client of above average intelligence.  He was always actively engaged in the discussions and would often have a list of questions."  (Doc. 12-1, p. 7).

Given the record and the "strong presumption" that Mr. Nelson truthfully stated in his change of plea hearing that he understood his plea agreement, Mr. Nelson has not established that Mr. Tewalt's discussions with him concerning the plea agreement were inadequate.  Additionally, because the Court reviewed the terms of the plea agreement with Mr. Nelson during his change of plea hearing while he was under oath, Mr. Nelson has not established that Mr. Tewalt's allegedly deficient review of the plea agreement with him prejudiced him.

Mr. Nelson argues that he received nothing of value in his plea agreement and that Mr. Tewalt "acted as an agent for the prosecution when he coerced, pressured, and threatened his client for the purpose of obtaining a guilty plea."  (Doc. 1, pp. 17-18).  Mr. Nelson asks:  "what can it matter if one is to be sentenced to 140 years (the sentence received), 180 years (the sentenced requested by the prosecution), or 3,900 years (the sentence threatened by the prosecution)?  All three sentences equate to 'never get out of prison alive.'"  (Doc. 1, p. 17).

21

Again, the record contradicts Mr. Nelson's argument.  The plea agreement states that in exchange for a guilty plea as to Counts I through VII, the United States agreed "not to file additional charges for attempted production of child pornography, receipt of child pornography, or possession of child pornography for images created by [Mr. Nelson] at a dance studio in Huntsville, Alabama" which "could be more than approximately 130 additional criminal counts . . . ."  (Crim. Doc. 10, p. 1).  Because of the plea agreement, Mr. Nelson avoided a trial.  At his sentencing hearing, the mother of a ten-year-old victim spoke.  (Crim. Doc. 33, p. 20).  So did the grandmother of two minor victims, one who was seven years old and one who was eleven years old when Mr. Nelson filmed them in the bathroom of their dance studio.  (Crim. Doc. 33, pp. 21–22).  Had he decided to maintain his plea of not guilty and go to trial, Mr. Nelson would have had to confront that evidence and other evidence concerning the one-million-plus images he had made and collected.  (Crim. Doc. 33, p. 22).[4]

_____

[4] That evidence may have included images involving Mr. Nelson's daughters or Mr. Nelson's niece who "had been video recorded while being molested."  (Doc. 12-1, p. 7).  At Mr. Nelson's sentencing hearing, Mr. Tewalt stated that, "based on the nature of the emotions and everything involved" in Mr. Nelson's case, Mr. Nelson did not want to address the Court.  (Crim. Doc. 33, p. 13).

Mr. Nelson's parents likely would have sat through that difficult trial and endured the publicity that a trial likely would produce.[5]   With Mr. Nelson's permission, Mr. Tewalt kept Mr. Nelson's father apprised of his case, (Crim. Doc. 32, p. 22), and Mr. Nelson may have consulted with his father before deciding how to proceed.   The record contains no support for Mr. Nelson's assertion that Mr. Tewalt threatened him to coerce a guilty plea.   The Court specifically asked Mr. Nelson if anyone had threatened him, and Mr. Nelson said no.  (Crim. Doc. 32, p. 21).   True, Mr. Nelson's options were a choice between two unpleasant paths, but he chose the easier path with the assistance of his attorney.   Mr. Nelson has not established that Mr. Tewalt's advice concerning the plea agreement was inadequate.

### *Constitutionality of the Child Pornography Statutes and Sentencing Guidelines*

Mr. Nelson argues that Mr. Tewalt should have challenged the constitutionality of the statutes and sentencing guidelines that governed the charges against him.  (Doc. 1, p. 18).   Mr. Nelson contends that the statutes and guidelines are void for vagueness, violate the ban on cruel and unusual punishment, exceed Congress's authority under the Commerce Clause, and infringe on the rights and powers reserved to the states.  (Doc. 1, p. 18).

---

[5] Mr. Nelson's aunt and uncle adopted him.  Mr. Nelson regards his aunt and uncle as his parents. (Crim. Doc. 17, p. 21).

Mr. Tewalt's representation of Mr. Nelson was not deficient because he did not challenge for vagueness the child pornography criminal statutes and sentencing guidelines. "The Supreme Court has never held that the Sentencing Guidelines are subject to a vagueness challenge." *In re Rivero*, 797 F.3d 986, 991 (11th Cir. 2015). The Eleventh Circuit has held that the "advisory sentencing guidelines cannot be challenged as void for vagueness." *United States v. Matchett*, 837 F.3d 1118, 1119 (11th Cir. 2016) ("[T]he vagueness doctrine applies only to laws that regulate the primary conduct of private sentences.  Advisory sentencing guidelines regulate judges, not private individuals; they guide judicial discretion within a statutory range.  Advisory sentencing guidelines do not define crimes or fix punishments.").

In contrast, a court may find a statute void for vagueness.  "Because we so highly value liberty, restrictions on our liberty must be spelled out with sufficient clarity to put citizens on notice of what conduct is prohibited and with enough definiteness to limit arbitrary law enforcement." *U.S. v. Acheson*, 195 F.3d 645, 652 (11th Cir. 1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)).  "A statute will be held void for vagueness if it does not 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement.'" *Acheson*, 195 F.3d at 652 (quoting *Lawson*, 461 U.S. at 357).

Congress has defined "child pornography" as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture" involving a minor engaged in "sexually explicit conduct." 18 U.S.C. § 2256(8). Congress has defined "sexually explicit conduct" as actual or simulated sexual intercourse between persons of the same or opposite sex; "bestiality; . . . masturbation; . . . sadistic or masochistic abuse; or . . . lascivious exhibition of the genitals or pubic area of any person . . . ." 18 U.S.C. § 2256(2)(A). In *Acheson*, the Eleventh Circuit held that "the [Child Pornography Prevention Act] defines the criminal offense with enough certainty to put an ordinary person on notice of what conduct is prohibited. A reasonable person is on notice that possessing images appearing to be children engaged in sexually explicit conduct is illegal." *Acheson*, 195 F.3d at 652; *see also United States v. Cabezas*, 797 Fed. Appx. 415, 419 (11th Cir. 2019) ("[W]e have explicitly held that 18 U.S.C. § 2252A is not unconstitutionally vague."). Because the Eleventh Circuit held in 1999 that statutes criminalizing child pornography are not void for vagueness, Mr. Nelson's attorney was not ineffective for failing to challenge the constitutionality of the statutes on that basis.

Similarly, Mr. Tewalt was not ineffective for foregoing a challenge to the constitutionality of the punishments for child pornography crimes under the Eighth Amendment's prohibition on cruel and unusual punishment. In *U.S. v. Johnson*, Mr.

Johnson appealed his 140-year sentence for violating 18 U.S.C. §§ 2251(a) and 2252A(a)(1), arguing that his sentence was excessive and constituted cruel and unusual punishment in violation of the Eight Amendment.  451 F.3d 1239, 1240, 1242 (11th Cir. 2006).  The Eleventh Circuit rejected Mr. Johnson's constitutional challenge.  The Court of Appeals explained that "a sentence within the statutory limits generally does not violate the Eighth Amendment," and "[o]utside the context of capital punishment, there are few successful challenges to the proportionality of sentences." *Johnson*, 451 F.3d at 1242–43 (citing *U.S. v. Raad*, 406 F.3d 1322, 1323 (11th Cir. 2005)).  The Eleventh Circuit found that because "the district court sentenced Johnson within the statutory limits, he has not made a threshold showing of disproportionality with respect to his sentence." *Johnson*, 451 F.3d at 1243. While "Johnson's [140-year] sentence is severe" it is "not more severe than the life long [*sic*] psychological injury he inflicted upon his three young victims.  His sentence is neither excessive nor cruel and unusual." *Johnson*, 451 F.3d at 1243– 44.

The Court sentenced Mr. Nelson within the guideline range, just like Mr. Johnson.  The Court sentenced Mr. Nelson to a term of 360 months each as to Counts 1, 2, 3, and 4, to run consecutively, and 240 months each as to Counts 5, 6, and 7, to run concurrently to each other but consecutively to Counts 1-4.  (Crim. Doc. 19, p. 2).  This results in a total sentence of 1,680 months of incarceration.  (Crim. Doc.

19, p. 2).   The Court found "that the guidelines offense level is 43, the criminal history category is one, and the advisory guideline imprisonment term is life." (Crim. Doc. 33, p. 6).   Therefore, Mr. Nelson's 1,680-month sentence fell within the guideline range.   Mr. Nelson's sentence, while severe, meets the harm that he caused to his victims and to the community at large.   Therefore, Mr. Tewalt was not ineffective for failing to challenge Mr. Nelson's sentence on the basis of the Eighth Amendment.

Likewise, at the time of Mr. Nelson's sentencing, the Eleventh Circuit already had addressed and rejected the Commerce Clause challenge that Mr. Nelson argues his attorney should have made.   In *United States v. Maxwell*, the Eleventh Circuit discussed whether, considering the Supreme Court's decision in *Gonzales v. Raich*, 545 U.S. 1 (2005), Congress can regulate child pornography under its Commerce Clause powers.   After *Raich*, "where Congress comprehensively regulates economic activity, it may constitutionally regulate intrastate activity, whether economic or not, so long as the inability to do so would undermine Congress's ability to implement effectively the overlying economic regulatory scheme," and "courts have only a limited role in second-guessing whether a 'class of [non-commercial] activity … undercut[s]' Congress's unquestioned authority to regulate the broader interstate market."   *United States v. Maxwell*, 446 F.3d 1210, 1215 (11th Cir. 2006) (quoting *Raich*, 545 U.S. at 18).

The Eleventh Circuit explained that statutes criminalizing child pornography attempt "to eliminate the entire market for child pornography, which, as the [Supreme] Court noted in *Raich*, is just as valid an exercise of the Commerce Clause authority as price and volume controls of an otherwise legal market." *Maxwell*, 446 F.3d at 1217. "[P]ornography begets pornography, regardless of its origin," and "[i]t is well within Congress's authority to regulate directly the commercial activities constituting the interstate market for child pornography, and '[p]rohibiting the intrastate possession … of an article of commerce is a rational … means of regulating commerce in that product.'" *Maxwell*, 446 F.3d at 1218 (quoting *Raich*, 545 U.S. at 26).[6]   Ultimately, the Eleventh Circuit concluded "that it is within Congress's authority to regulate *all* intrastate possession of child pornography, not just that which has traveled in interstate commerce or has been produced using materials that have traveled in interstate commerce." *Maxwell*, 446 F.3d at 1218 (emphasis in original).

---

[6] In determining the need for federal laws proscribing child pornography, the Senate Judiciary Committee "found that pornography was a highly organized, multi-million dollar industry that operated on a nationwide scale." Danielle Wild, Note, *You're Reckless and You Should Know It: Why the "Making Available" Theory Distorts the Mental Culpability Required Under 18 U.S.C. § 2252(A)(2)*, 65 SYRACUSE L. REV. 191, 201 (2014) (citing S. Rep. No. 95-438, at 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 42).

Because the Eleventh Circuit affirmed Congress's Commerce Clause authority to regulate child pornography before Mr. Nelson's sentencing, Mr. Nelson's attorney was not ineffective for failing to raise a Commerce Clause challenge.

Still, Mr. Nelson contends that because states have statutes criminalizing creation, possession, and distribution of child pornography, the federal child pornography criminal statutes violate the Tenth Amendment to the United States Constitution.  On this point, the Eleventh Circuit has not spoken, but many other federal courts have.  For example, in *United States v. Laursen*, the United States Court of Appeals for the Ninth Circuit considered whether federal child pornography statutes usurp states' power under the Tenth Amendment.   Because child pornography statutes "include an interstate nexus" and are not like "a garden variety assault that is ordinarily prosecuted under state law," the Ninth Circuit rejected the defendant's Tenth Amendment challenge.  *United States v. Laursen*, 847 F.3d 1026, 1035 (9th Cir. 2017)*; see also U.S. v. Flynn*, No. CR. 10-40012, 2010 WL 1459476, at *4 (D.S.D. Mar. 19, 2010) ("The Eighth Circuit has repeatedly recognized the federal child pornography statutes as a valid exercise of Congressional authority under the Commerce Clause.  It is therefore beyond doubt that § 2252 does not violate the Tenth Amendment.") (internal citations omitted); *Phillips v. United States*, 2014 WL 3965050, at *7 (D. Del. Aug. 12, 2014) (concluding in a § 2255

habeas petition that defendant's attorney did not provide ineffective assistance of counsel by failing to raise "meritless argument" that federal child pornography statutes violate the Tenth Amendment); *U.S. v. Mortenson*, No. CR 06-39-GF-SEH, 2013 WL 709091, at *3 (D. Mont. Feb. 26, 2013) (same).

Because the Eleventh Circuit has held that federal child pornography statutes are a valid exercise of Congress's Commerce Clause power, the statutes do not violate the Tenth Amendment. Therefore, Mr. Tewalt's decision not to argue the statutes' invalidity under the Tenth Amendment does not constitute ineffective assistance.

### Mr. Nelson's Failure to Receive a Copy of his PSR

Mr. Nelson complains that Mr. Tewalt "failed to ensure" that he (Mr. Nelson) saw a copy of his PSR before his sentencing hearing. (Doc. 1, p. 19). Because Mr. Nelson was in custody before his sentencing hearing, Mr. Tewalt could not give Mr. Nelson a copy of his PSR. The Bureau of Prisons prohibits inmates from possessing PSRs "to protect inmates from being coerced by other inmates to produce their PSRs . . . for illicit purposes. Inmates will be permitted to review their PSRs . . . but cannot obtain or possess photocopies." U.S. DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS PROGRAM STATEMENT 1351.05, RELEASE OF INFORMATION, https://www.bop.gov/policy/progstat/1351_005_CN-1.pdf (last visited Oct. 15, 2020). Under Rule 32 of the Federal Rules of Criminal Procedure, Mr. Tewalt was

obligated to review the PSR with Mr. Nelson, but he did not have to give Mr. Nelson a copy of the PSR.  *U.S. v. Duran*, 620 Fed. Appx. 687, 693 (11th Cir. 2013) ("In the absence of some indication to the contrary, a sentencing judge is permitted to rely on an attorney's submission that he has gone over the PSR with his client.").[7]

During Mr. Nelson's sentencing hearing, the Court asked him if he had had the opportunity to discuss the PSR with his attorney, and Mr. Nelson said he had. (Crim. Doc. 33, p. 3).  Mr. Tewalt told the Court that he and Mr. Nelson had had 35 days in which to review the PSR, and Mr. Tewalt filed written objections to the PSR. (Crim. Doc. 33, p. 3; Crim. Doc. 13).  In his affidavit concerning Mr. Nelson's § 2255 motion, Mr. Tewalt stated that he met with Mr. Nelson and discussed the guideline calculation in the PSR.  (Doc. 12-1, pp. 5, 7).

Though the better practice may have been to allow Mr. Nelson to review his PSR in the presence of counsel, on the record before it, the Court cannot conclude that Mr. Tewalt's decision not to allow Mr. Nelson to read the complete report was

---

[7] In *United States v. Melvin*, the United States Court of Appeals for the Seventh Circuit concluded that Federal Rule of Criminal Procedure 32(e)(2) requires defendants to receive a copy of their presentence report.  *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020).  "Under its plain meaning, [Federal Rule of Criminal Procedure 32(e)(2)] cannot be satisfied by giving the PSR only to the defendant's and government's attorneys; the probation office also must give also [sic] the PSR to the defendant."  *Melvin*, 948 F.3d at 853.

Because of the risks associated with a defendant possessing his PSR in prison, the Seventh Circuit held that "district courts have discretion to determine where and for how long the defendant may possess the PSR, taking into consideration the specific safety concerns in each case."  *Melvin*, 948 F.3d at 853.

deficient representation because there may have been a legitimate, strategic reason to simply discuss the contends of the PSR with Mr. Nelson.  Still, assuming for the purposes of this opinion that Mr. Tewalt should have allowed Mr. Nelson to read the PSR before his sentencing hearing, Mr. Nelson is not entitled to relief because he has not demonstrated that he would have received a different sentence had he read his PSR.  Again, the Court sentenced Mr. Nelson within the guideline range, and the Court considered and overruled Mr. Nelson's objection to his PSR.  (Crim. Doc. 33, pp. 3–6).  Because Mr. Nelson has not satisfied the prejudice prong of the *Strickland* test, he is not entitled to relief based on his attorney's failure to give him a complete copy of his PSR to read.

### *Attorney Conflict*

Finally, Mr. Nelson argues that Mr. Tewalt was ineffective because federal public defenders are "overworked, have heavy caseloads, and cannot properly investigate every case, therefore cannot provide every defendant with an adequate defense," (Doc. 1, p. 20), and because attorneys in the United States Attorney's Office and the Federal Public Defender's Office "deal in quid pro quo on a regular basis," (Doc. 15, p. 75).  So, "[b]y not rigorously defending his client, counsel builds up 'brownie points' and 'political capital' . . . that may be called in or otherwise put to use when a more favorable, defendable, or sympathetic client comes along." (Doc. 15, p. 75).  No one will argue with the general proposition that attorneys in the

Federal Public Defender's Office are extremely busy and that they regularly work opposite attorneys from the United States Attorney's Office, but Mr. Nelson has not identified a specific conflict or resulting error that he attributes to Mr. Tewalt's workload or his working relationship with attorneys who regularly appear against him in criminal cases.[8]

A defendant claiming ineffective assistance due to a conflict of interest must identify an "actual conflict"—that is, a "conflict [that] adversely affected his counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 174 (2002); *see also Mickens*, 535 U.S. at 171 (explaining that an "actual conflict" is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties"). For public defenders, an actual conflict of interest generally occurs when an attorney "discover[s] that a victim or witness is a former or current client of the same public defender office representing the accused." Jeff Brown, *Disqualification of the Public Defender: Toward A New Protocol for Resolving Conflicts of Interest*, 31 U.S.F. L. Rev. 1, 4 (1996); *U.S. v. Sablan*, 176 F. Supp. 2d 1086, 1090 (D. Colo.

---

[8] Though attorneys on opposite sides of a case are adversaries and have an ethical obligation to advocate for their clients' interests (which often conflict), clients generally benefit from a collegial relationship between or among opposing counsel. A good working relationship fosters compromise when compromise is in the parties' best interests. AUSAs and public defenders must communicate to negotiate plea agreements. *See U.S. v. Goldberg*, 937 F. Supp. 1121, 1138–39 (M.D. Pa. 1996) (stating that attorneys in the Federal Public Defender's Office "are intimately familiar with criminal practice in this court and deal with the various offices (chambers, Clerk of Court, Probation & Parole, U.S. Attorney, etc.) on a regular basis.").

2001) (federal public defender had actual conflict because other attorneys in the Office of the Federal Public Defender represented a potential witness).

Mr. Nelson has not identified an actual conflict of interest in his case. Therefore, the Court denies his ineffective assistance of counsel claim on this ground.

## IV.

Accordingly, the Court denies Mr. Nelson's ineffective assistance claims based on grounds two through six. The Court will set an evidentiary hearing to evaluate Mr. Nelson's ineffective assistance of counsel claim relating to his *Miranda* waiver.

**DONE** and **ORDERED** this April 22, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE