FILED
2024 Sep-30  AM 11:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JEREMY NELSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:17-cv-8012-MHH** |
| **UNITED STATES OF AMERICA,** | ) | **5:14-cr-372-MHH-HNJ** |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

Jeremy Nelson filed a motion to vacate his conviction and sentence under 28 U.S.C. § 2255.  (Doc. 1).  Mr. Nelson seeks relief from the judgment against him based on ineffective assistance of counsel.  The Court denied Mr. Nelson's ineffective assistance of counsel claim on five of the six grounds he asserts in his motion.  (Doc. 17, p. 34).[1]  The Court held an evidentiary hearing on Mr. Nelson's remaining claim for ineffective assistance of counsel concerning his confession and his consent to search his house.  (Doc. 17; Doc. 35).  Mr. Nelson contends that when he confessed and consented to the search, his alcohol and marijuana impairment

---

[1]  All "Doc." record cites refer to docket entries in this habeas case; "Crim. Doc." refers to docket entries in Mr. Nelson's underlying criminal case, No. 5:14-cr-00372-MHH-HNJ-1.

rendered his confession and consent involuntary.[2]   Mr. Nelson asserts that his attorney should have filed a motion to suppress the confession and evidence obtained by law enforcement in the search.[3]

This opinion addresses Mr. Nelson's remaining claim.   The Court first identifies the ineffective assistance of counsel standard that governs Mr. Nelson's claim.   Then, the Court discusses summarizes the testimony from the evidentiary hearing.   Finally, the Court evaluates Mr. Nelson's ineffective assistance of counsel arguments under the applicable legal standards.

## I.

*Strickland v. Washington* governs claims for ineffective assistance of counsel. 466 U.S. 668, 687–88, 694 (1984).   To establish ineffective assistance of counsel, a defendant must prove "that his counsel's performance was deficient and that his

---

[2]  In his § 2255 motion, Mr. Nelson asserts that he was incapacitated because he had injected insulin that caused an "extremely low blood sugar level," he was drunk, and he was sleep deprived. (Doc. 1, pp. 13–14).   During the evidentiary hearing, Mr. Nelson did not mention that insulin or low blood sugar caused his incapacitation.   Mr. Nelson's father testified that he did not know if Mr. Nelson had taken insulin the morning of his arrest.  (Doc. 35, p. 29).

[3]  Mr. Nelson testified that counts one through four of the indictment were based on incriminating statements he made to Agent Smith.  (Doc. 35, p. 21).   Mr. Nelson "focuses on the prejudice suffered by him as to his convictions on Counts 1-4" and concedes that the United States "has sufficient evidence to convict on Counts 5-7."  (Doc. 40, p. 2).   If Mr. Nelson were convicted only of the conduct in counts five, six, and seven, Mr. Nelson would have an offense level of 35.  (Crim. Doc. 17, p. 17, ¶ 90).   Given Mr. Nelson's criminal history category of I, (Doc. 17, p. 20, ¶ 104), his guideline range would have been 168-210 months.   *See* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2014/2014sentencing_table.pdf (last visited Sept. 25, 2024).

counsel's deficient performance prejudiced him." *Andrus v. Texas*, 590 U.S. 806, 813 (2020) (citing *Strickland*, 466 U.S. at 688). To satisfy the performance prong, a defendant must establish by a preponderance of the evidence that his attorney's performance was unreasonable. *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citation omitted). Deficient performance is "'representation [that falls] below an objective standard of reasonableness.'" *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 551 (11th Cir. 2015) (citing *Strickland*, 466 U.S. at 688). In evaluating the effectiveness or ineffectiveness of a defendant's attorney, a district court must consider the totality of the circumstances to determine whether the defendant had adequate representation. *Stanley v. Zant*, 697 F.2d 955, 962 (11th Cir. 1983). A criminal defendant is not entitled to the very best legal representation; adequate representation satisfies the constitutional standard. *Stewart*, 476 F.3d at 1209; *Stone v. Dugger*, 837 F.2d 1477 (11th Cir. 1988). A defendant "'must establish that no competent counsel would have taken the [challenged] action.'" *Khan v. United States*, 928 F.3d 1264, 1272 (11th Cir. 2019) (quoting *Chandler v. United States*, 218 F.3d 1305, 1314-15 (11th Cir. 2000)). With respect to motions to suppress, a defendant must prove that "no competent attorney would think that a motion to suppress would have failed." *Premo v. Moore*, 562 U.S. 115, 124 (2011). An attorney is "not ineffective for failing to raise a nonmeritorious claim." *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001).

3

A defendant must meet a high burden to establish that his attorney's deficient performance prejudiced his case. *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002). A defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Where a petitioner faults his lawyer for failing to pursue a motion to suppress prior to entering a plea, both the deficient performance and prejudice prongs of *Strickland* turn on the viability of the motion to suppress." *Arvelo v. Sec'y Fla. Dep't of Corr.*, 788 F.3d 1345, 1348 (11th Cir. 2015). If a defendant does not satisfy both prongs of the *Strickland* test, then a district court must deny the defendant's § 2255 motion. *Strickland*, 466 U.S. at 687. If a court decides that one prong has not been established, then the court does not have to reach the other prong. *Strickland*, 466 U.S. at 687; *Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998).

## II.

As the Court explained in more detail in its earlier memorandum opinion, (Doc. 17), Mr. Nelson pleaded guilty in February 2015 to seven counts related to the possession and creation of child pornography. (Doc. 17, pp. 5-7). The Court sentenced Mr. Nelson to a prison term of 1,680 months, and the Eleventh Circuit

Court of Appeals upheld that sentence because Mr. Nelson's plea agreement contained a valid appeal waiver. (Doc. 17, pp. 8-9).

In his § 2255 motion, Mr. Nelson contends that his trial attorney was ineffective for six reasons. (Doc. 1, pp. 14-20; Doc. 17, p. 10). The Court denied Mr. Nelson's § 2255 motion as to grounds two through six, (Doc. 17, pp. 13-34), and held an evidentiary hearing on Mr. Nelson's claim that his attorney "failed to make any effort whatsoever toward suppression of any statement, waiver, or evidence obtained by the police." (Doc. 1, p. 13; Doc. 17, p. 34; Doc. 35). Five witnesses testified at the hearing: Mr. Nelson; his father, Donald Nelson; Mr. Nelson's trial attorney, Michael Tewalt; Homeland Security Investigations – HSI – Special Agent Bobby Ray Smith; and FBI Task Force Officer Scott Salser. (Doc. 35).[4]

The federal investigation of Mr. Nelson began with a tip from HSI's Nashville office. (Doc. 35, pp. 57-58). A search warrant executed in Tennessee led to an IP address from Alabama connected to Mr. Nelson. (Doc. 35, p. 58). On the morning of October 7, 2014, Agent Smith executed a search warrant for the residence associated with the IP address. (Doc. 35, pp. 57-58). Agent Smith, HSI Special Agent Suzanne Prevatte, and Tom Whitten with the state police briefly interviewed

---

[4] Mr. Tewalt worked for the Federal Public Defender's Office when he represented Mr. Nelson in his criminal case. Mr. Tewalt no longer works for the Federal Public Defender's Office, but he is on the CJA panel. (Doc. 12-1, p. 1; Doc. 35, p. 43).

Donald Nelson and other family members at the address on the warrant. (Doc. 35, p. 58). Those interviews led agents "to believe that it was definitely [Mr. Nelson] that had been the one that was distributing the child pornography." (Doc. 35, p. 58). Donal Nelson provided Mr. Nelson's address, and the agents went to that address about a mile away. (Doc. 35, pp. 24, 58-59).

According to Mr. Nelson, the agents arrived at his house near 10:00 a.m. (Doc. 35, p. 7). Agent Smith knocked on the door, and Mr. Nelson answered. (Doc. 35, p. 59). Agent Smith indicated that he was investigating the distribution of child pornography and asked to enter the residence and to speak with Mr. Nelson; Mr. Nelson agreed. (Doc. 35, pp. 59-60). When Agent Whitten noticed external hard drives and other computer equipment in plain view, Mr. Nelson began "getting agitated" and asked to speak to Agent Smith alone. (Doc. 35, p. 60). Agent Whitten and Agent Prevatte left the room, but Agent Prevatte remained outside the door out of sight to ensure Agent Smith's safety. (Doc. 35, p. 60).

Agent Smith explained to Mr. Nelson that his team had evidence that Mr. Nelson had distributed child pornography to someone in Tennessee and wanted to discuss that evidence. (Doc. 35, p. 61). Agent Smith explained to Mr. Nelson that he was not under arrest; Agent Smith did not handcuff Mr. Nelson or "restrain [him] in any way" and did not tell Mr. Nelson to stay in a particular area. (Doc. 35, p. 62).

6

Mr. Nelson acknowledges that he was not handcuffed or under arrest during the interview. (Doc. 35, p. 15, 17).

Agent Smith read Mr. Nelson his *Miranda* rights and had Mr. Nelson initial right after Mr. Nelson indicated that he understood the right.  (Doc. 35, p. 61; Doc. 36-1, p. 1).  Mr. Nelson acknowledges that he signed a waiver of his *Miranda* rights and a consent to search but testified that agents did not read him the *Miranda* rights until they arrested him, at which point they already had questioned him for "some time," and he had "[gone] over everything with them." (Doc. 35, pp. 8-9; Doc. 36-1).[5]

During the interview with Agent Smith, Mr. Nelson admitted that he possessed child pornography, and it was "going to be the most child pornography that [Agent Smith] had ever seen."  (Doc. 35, p. 63).  Mr. Nelson "was adamant that [he was] a monster" and that he was "going to spend the rest of his life in prison" because of the amount of child pornography on his hard drive.  (Doc. 35, p. 63).  Mr. Nelson told Agent Smith "exactly where to look for cameras" and showed Agent

---

[5]  Mr. Nelson's plea agreement states: "Following [Mr. Nelson's] verbal and written Miranda Warning and Waiver, [Mr. Nelson] provided verbal and written admissions of attempting to produce images of child pornography of various children, including children he knew . . . and children at a dance studio that he did not know."  (Crim. Doc. 10, p. 5).  During the plea hearing, Mr. Nelson confirmed that the facts in the plea agreement were substantially correct and that he understood that a court would use those facts as a basis for calculating a sentence.  (Crim. Doc. 32, pp. 15–16).  The Court has denied Mr. Nelson's § 2255 motion on the ground that Mr. Tewalt's discussions with Mr. Nelson concerning the plea agreement, including the factual basis for the plea, were inadequate.  (Doc. 17, pp. 16-21).

Smith "fairly sophisticated" pinhole cameras that Mr. Nelson had built.  (Doc. 35, pp. 63-64).  Agent Smith testified that Mr. Nelson gave him "locations where hidden cameras were that were actively still producing."  (Doc. 35, pp. 64-65).  Agent Smith does not think that law enforcement would have found all of the cameras if Mr. Nelson had not revealed the cameras' locations.  (Doc. 35, pp. 64-65).

During the interview with Agent Smith, Mr. Nelson did not ask for a lawyer, did not indicate he did not want to talk, and did not state that he was intoxicated or sleep deprived.  (Doc. 35, p. 64).  Agent Smith testified that he saw no sign that Mr. Nelson was impaired and that Mr. Nelson gave coherent, detailed responses to questions.   (Doc. 35, pp. 64-65).   Agent Smith was "confident [Mr. Nelson] understood the contents of [the Miranda] form."  (Doc. 35, p. 65).

Mr. Nelson wrote a statement on October 7, 2014 in which he acknowledged that he had "an extensive collection of child pornography;" that he had placed hidden cameras "throughout [his] bathroom to catch [his] daughters [and] other girls changing;" that he "made a few videos of [his] daughters" a few years prior; that he hid "wall outlet hidden cameras" at Anne's Dance Studio; and that he had hidden cameras at Channel 19 and car dealerships in Huntsville.  (Doc. 36-1, pp. 3-4).  Mr. Nelson signed a consent for law enforcement to search his desktop computers, tablet, phones, camera, hard drives, SD cards, and flash drives; Agent Smith witnessed the consent form.  (Doc. 36-1, p. 2).  Mr. Nelson testified that the agents "said that they

8

didn't have a warrant and that . . . if they [were] to have to go get a warrant, they [were] going to basically tear the house apart and throw everything they could at me. But if [he] was to consent, then [he] would be shown leniency." (Doc. 35, p. 8).

Mr. Nelson was arrested and taken to the Madison County Sheriff's Office. (Doc. 35, p. 66). Agent Salser testified that he was present when law enforcement apprehended Mr. Nelson at his house, but he did not "interact with [Mr. Nelson] until [they] got to the jail." (Doc. 35, p. 70). Before conducting an interview with Mr. Nelson at the jail, Agent Salser read Mr. Nelson his *Miranda* rights and had him initial each "bullet point" to "acknowledge that [Agent Salser] read that line to him." (Doc. 35, p. 67). Mr. Nelson executed a written waiver of his *Miranda* rights at 2:48 PM. (Doc. 35, p. 67; Doc. 36-2). Agent Salser recorded the interview. (Doc. 35, pp. 67-68; Gov. Ex. 2 conventionally filed). Mr. Nelson admits that he signed a second *Miranda* waiver before Agent Salser's interview and stated that he was "pretty much" sober when he signed it. (Doc. 35, pp. 9-10).[6]

Mr. Nelson told Agent Salser about cameras that he (Mr. Nelson) "had created or built cameras that he ordered off the Internet;" that he had "placed [the cameras]

---

[6] In his sworn § 2225 motion, Mr. Nelson indicated that he was "placed in the 'drunk tank'" at the jail and that his impairment was worse by the time of the second interrogation "due to the circumstances at the jail where the interrogation took place, that is, still no sleep because of the noisy drunks occupying the holding area." (Doc. 1, p. 14). Mr. Nelson testified that someone helped him write the § 2255 motion, but he went over everything in the motion "in detail" and "made sure every statement in [the motion] was correct." (Doc. 35, p. 12). There is no testimony from Mr. Nelson or the agents that Mr. Nelson was placed in the drunk tank at the jail.

in a dance studio, a car dealership, and a news station;" and that "at the dance studio[,] he recorded children changing clothes." (Doc. 35, p. 68). Agent Salser testified that in his experience observing intoxicated people as a former officer with the Birmingham Police Department, Mr. Nelson did not show symptoms of intoxication during the interview and appeared to understand what Agent Salser told him. (Doc. 35, pp. 68-69). Agent Salser testified that he did not threaten Mr. Nelson or make promises to him. (Doc. 35, p. 69).

Mr. Nelson testified that he wanted Mr. Tewalt to file a motion to suppress because he (Mr. Nelson) "was not in [his] right state of mind" when he spoke to law enforcement and permitted a search of his home. (Doc. 35, pp. 5-6). According to Mr. Nelson, when he returned home from the night-shift work, he habitually "dr[a]nk until [he] either pass[ed] out at the computer desk or stumble[d] off to bed." (Doc. 35, p. 6). Mr. Nelson mostly slept until noon and sometimes until 2:00 in the afternoon. (Doc. 35, p. 6). Mr. Nelson testified that he smoked marijuana the night before his arrest. (Doc. 35, p. 6). He routinely "stay[ed] up drinking and smoking pot at night" until "probably eight in the morning." (Doc. 35, p. 6). Mr. Nelson did not recall the time that law enforcement agents woke him the morning of his arrest, but he "assume[d] around probably ten" in the morning. (Doc. 35, p. 7). Mr. Nelson

stated that agents came well before he woke up on his own, "so [he] was still intoxicated" when the agents knocked on his door.  (Doc. 35, pp. 6-7).

Mr. Nelson testified that he told Mr. Tewalt about his impairment, but Mr. Tewalt "was shooting down everything."  (Doc. 35, p. 11).  Mr. Nelson stated that Mr. Tewalt advised that because he (Mr. Nelson) was not "staggering drunk or just basically really drunk" when he signed the *Miranda* waiver and consented to the search, a motion to suppress "wasn't going to work."  (Doc. 35, p. 11).  Mr. Nelson indicated that he "knew [he] wasn't staggering drunk" during the first interview but was "probably still half drunk," and "more than just buzzed."  (Doc. 35, pp. 11, 15). Mr. Nelson stated that he was "just not thinking clearly" and that he was trying to figure out [] what was going to become of [him]."  (Doc. 35, p. 17).  Mr. Nelson admitted that he did not tell the agents that he was intoxicated and that he was not "so impaired that he couldn't write out a statement" in his own handwriting.  (Doc. 35, pp. 17, 20).

Donald Nelson testified that he witnessed his son abuse marijuana and alcohol.  (Doc. 25, p. 23).  Donald Nelson explained that when Mr. Nelson was drunk or extremely tired, Mr. Nelson would rant and rave "about how he was a savior," would ramble about his inventions, and "could not shut up."  (Doc. 35, p. 23). Donald Nelson testified that he had no inkling that his son "was interested in child

pornography." (Doc. 35, pp. 24, 29-30).[7]  When agents came to his house, Donald

Nelson asked to see the agents' search warrant and testified that the warrant bore his

address but Mr. Nelson's name.  (Doc. 35, p. 24).  Donald Nelson gave agents Mr.

Nelson's address.  (Doc. 35, p. 24).

After they left his house, agents called Donald Nelson and asked him to come

to Mr. Nelson's house to pick up a box of Mr. Nelson's personal items.  (Doc. 35,

pp. 25, 32).  Donald Nelson arrived at Mr. Nelson's house around 9:30 a.m. and saw

that Mr. Nelson was holding a box, and his "hair was messed up, his eyes were

bloodshot, and his skin was a pa[l]e white."  (Doc. 35, p. 25).  Donald Nelson took

the box from Mr. Nelson and told him to "be honest and tell them everything."  (Doc.

35, p. 25).  Donald Nelson testified that he talked with Mr. Nelson for "probably less

than three minutes," and Mr. Nelson "wasn't very coherent."  (Doc. 35, pp. 25, 34).

Donald Nelson testified that he was not sure Mr. Nelson "knew where he was at the

time or what was going on," that Mr. Nelson "had trouble following what [his father]

---

[7]  In a February 2017 deposition in a civil lawsuit against Mr. Nelson based on the "same facts as the conduct for which [he was] convicted," Mr. Nelson testified that his dad knew "about [Mr. Nelson] viewing images of children . . . or looking online."  (Doc. 35, pp. 17, 30; Doc. 36-3, p. 20).  Mr. Nelson testified in the civil deposition that he had downloaded nude photos of children on his dad's computer, and his dad found the pictures and deleted them.  (Doc. 36-3, p. 20).  Mr. Nelson's dad told Mr. Nelson that he "needed to think about what [he] was doing and quit" and that he did not "want any more done on his computer."  (Doc. 36-3, p. 20).  When asked about Mr. Nelson's deposition testimony at the evidentiary hearing in this case, Donald Nelson admitted that "[t]here was a point where" he may have known that Mr. Nelson possessed child pornography, but "it was nude pictures like on a beach."  (Doc. 35, pp. 30-31).  Donald Nelson testified that the nude pictures on the beach were adults, and "there were children in bathing suits."  (Doc. 35, p. 31).  Donald Nelson did not recall whether he knew that Mr. Nelson "was interested in child pornography."  (Doc. 35, p. 31).

was saying," and that Mr. Nelson thought the agents "were after his marijuana." (Doc. 35, pp. 25-27, 34).  Donald Nelson stated that as he was leaving Mr. Nelson's house sometime "after 9:30 a.m.," "the federal agents read [Mr. Nelson] his rights . . . under the trees in front of the . . . four-wheel drive vehicle."  (Doc. 35, p. 32).

Mr. Tewalt testified that he represented Mr. Nelson in the child pornography case.  (Doc. 35, p. 36).[8]  Mr. Tewalt testified that Mr. Nelson was "one of the smartest clients [he had] represented in many years."  (Doc. 35, p. 42).  Mr. Tewalt stated that he had a "number of conversations" with Mr. Nelson about filing a motion to suppress.  (Doc. 35, pp. 37, 46).  Mr. Tewalt testified that from the first, Mr. Nelson told him that he (Mr. Nelson) did "not want to fight" the charges.  (Doc. 35, p. 38).  Mr. Tewalt discussed motions to suppress and motions in limine, but Mr. Nelson did not want to pursue either.  (Doc. 35, p. 39).  Mr. Tewalt stated that Mr. Nelson "wanted to accept responsibility, to try to mitigate, to try to get any kind of departure, vari[ance,] or otherwise" and did not want to "upset the prosecution." (Doc. 35, p. 39).

Mr. Tewalt testified that Mr. Nelson told him "that he had been drinking at the time of his initial interview," and they discussed Mr. Nelson's "level of impairment."  (Doc. 35, p. 40).  Mr. Tewalt testified that Mr. Nelson said he was a

---

[8]  At the time, Mr. Tewalt was the "Senior Assistant Public Defender in the Northern Division" who specialized in child pornography cases and "handled virtually all of the Northern Division's cases of child pornography."  (Doc. 35, p. 44).

"high functioning alcoholic and that nobody would be able to tell that he was impaired unless he had told them at the time." (Doc. 35, pp. 40, 44). Mr. Tewalt discussed with Mr. Nelson the "existing case law about impairment," and he and Mr. Nelson jointly decided not to file a motion to suppress. (Doc. 35, pp. 40-42).

Mr. Tewalt testified that Mr. Nelson told him that law enforcement did not read his *Miranda* rights to him before his first interview, and Mr. Tewalt explained to Mr. Nelson the circumstances in which law enforcement must read *Miranda* rights and the law regarding "excited utterances and spontaneous statements." (Doc. 35, p. 45). According to Mr. Tewalt, given his conversations with attorneys in his office, his research, and the facts of the case, he "did not see a "high likelihood of success" if he filed a motion to suppress. (Doc. 35, p. 45). Mr. Tewalt explained that there was no evidence that law enforcement coerced Mr. Nelson's confession, Mr. Nelson was not in custody when he gave his first statement, and Mr. Nelson did not disclose to law enforcement his level of impairment. (Doc. 35, pp. 44, 46).

Mr. Tewalt testified that he did not file a motion to suppress as part of his trial strategy, which included obtaining a "survivable sentence" for Mr. Nelson. (Doc. 35, pp. 37, 46). Mr. Tewalt testified that Mr. Nelson's cooperation and acceptance of responsibility "cut about forty years off his sentence." (Doc. 35, pp. 48-49). Mr. Tewalt testified that a motion to suppress "usually triggers an evidentiary hearing," and that at a hearing, more damaging information would have come to light that

14

could have been used against Mr. Nelson at sentencing.  (Doc. 35, pp. 51-52).  For example, Mr. Tewalt testified that Mr. Nelson told him that he (Mr. Nelson) molested his autistic niece and recorded it but that the government had not indicated that it had found such a video.  (Doc. 35, pp. 49-50).  Mr. Tewalt stated that because there were several additional charges for which the government could obtain a superseding indictment, his strategy was to "keep that video from ever being discovered" and to "enter into a quick guilty plea so [law enforcement] would not find that video."  (Doc. 35, p. 50).  Mr. Tewalt testified that charges based on Mr. Nelson targeting "an actual victim who was [autistic]" could have been "relevant conduct that Probation would have to include in a presentence report."  (Doc. 35, p. 51).  Mr. Tewalt felt that information could have made things "far worse than what [Mr. Nelson] was already facing."  (Doc. 35, pp. 50).  Mr. Tewalt testified that none of the information regarding that video was included in Mr. Nelson's presentence report.  (Doc. 35, p. 51).

Mr. Tewalt testified that his recommendation was that a motion to suppress "would not be productive" and that Mr. Nelson accepted Mr. Tewalt's advice not to file a motion to suppress as a defense strategy to minimize the sentence.  (Doc. 35, p. 55).

### III.

When a petitioner argues that his lawyer was ineffective for not filing a motion to suppress, the deficient performance and prejudice elements of a claim for ineffective assistance of counsel "turn on the viability of the motion to suppress." *Arvelo*, 788 F.3d at 1348.  Mr. Nelson must demonstrate that no reasonable lawyer would have acted as Mr. Tewalt and decided not to file a suppression motion.  *See Waters*, 46 F.3d at 1512.  Because Mr. Tewalt's advice not to file a motion to suppress was comfortably within the "wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, Mr. Nelson cannot meet his burden.

Mr. Nelson's argument concerning Agent Smith's purported failure to read him his *Miranda* rights before he (Mr. Nelson) made incriminating statements and consented to a search likely would not lead a court to suppress Mr. Nelson's statements and written confession based on an alleged *Miranda* violation.  Agent Smith testified that Mr. Nelson waived his *Miranda* rights, and the factual basis section in Mr. Nelson's plea agreement indicates that he waived his *Miranda* rights before he made statements to Agent Smith.  (Doc. 35, p. 61; Crim. Doc. 10, p. 5).

Even if the Court were to credit Mr. Nelson's post-judgment testimony that he made incriminating statements to Agent Smith and executed a written confession before he waived his *Miranda* rights, a motion to suppress the statements and confession likely would not have been successful because Mr. Nelson was not in

16

custody when he made the statements. Because *Miranda* warnings protect a defendant against the coercive aspects of custodial interrogation, an officer must provide warnings only when a defendant's freedom has been so restricted as to "render him in custody." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). If a defendant is not in custody, a district court cannot suppress his incriminating statements based on an alleged *Miranda* violation. *United States v. Woods*, 684 F.3d 1045, 1055 (11th Cir. 2012) (explaining that *Miranda* applies only to custodial interrogations). Whether a defendant is in custody before a formal arrest "depends on whether under the totality of the circumstances, a reasonable man in [the defendant's] position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (internal quotations and citations omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *McDowell*, 250 F.3d at 1362.

Mr. Nelson's testimony at the § 2255 evidentiary hearing does not indicate that his conversation with Agent Smith before his arrest amounted to a custodial interrogation that required a *Miranda* warning. Agent Smith interviewed Mr. Nelson in Mr. Nelson's home. (Doc. 35, pp. 59-60). "'[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least

neutral surroundings, such as the suspect's home.'" *United States v. Deason*, 965 F.3d 1252, 1261 (11th Cir. 2020) (quoting *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)).  Mr. Nelson acknowledges that Agent Smith told him that he was not under arrest.  (Doc. 35, pp. 15, 62).  "[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave."  *Brown*, 441 F.3d 1347.  Mr. Nelson was not handcuffed or restrained during the interview, and Agent Smith testified that he did not tell Mr. Nelson to stay in a particular room or restrain him in any way.  (Doc. 35, pp. 15, 62).  The fact that Mr. Nelson "was never handcuffed or otherwise physically restrained" indicates that he was not in custody during his conversation with Agent Smith.  *Brown*, 441 F.3d at 1349.

At Mr. Nelson's request, two agents left the room before Mr. Nelson spoke to Agent Smith.  (Doc. 35, pp. 60-62).  Thus, Mr. Nelson was able to determine who was in his home during the interview.  Mr. Nelson knew that the agents did not have a warrant to search his house because the agents told him so.  (Doc. 35, p. 8).  Mr. Nelson "cannot argue convincingly that a reasonable person would have believed at any time during the interview that he was not free to end it and have the agents leave."  *Deason*, 965 F.3d at 1260.

Considering the totality of the circumstances, a district court likely would have concluded that a reasonable person in Mr. Nelson's circumstances would have

felt in control of the situation and free to leave or end the conversation, such that no *Miranda* warning was required. Mr. Tewalt testified that he did not think a motion to suppress would be successful because Mr. Nelson was not in custody during the interview with Agent Smith. (Doc. 35, p. 46). Mr. Tewalt did not perform deficiently for not filing a motion to suppress on a ground a district court likely would have denied. *Pinkney v. Sec'y, Dept. of Corr.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform an futile act, one that would not have gotten his client any relief.").

Even if an interview with police was noncustodial, a district court still must ensure that a defendant's confession was voluntary. *United States v. Killen*, 729 Fed. Appx. 703, 708 (11th Cir. 2018) (citing *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010)). The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial. *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (citing *Bram v. United States,* 168 U.S. 532, 542 (1897), and *United States v. Vera,* 701 F.2d 1349, 1365 (11th Cir. 1983)). The voluntariness inquiry focuses "on whether the defendant was coerced by the government into making the statement: 'The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Mendoza–*

*Cecelia,* 963 F.2d 1467, 1475 (11th Cir. 1992) (quoting *Colorado v. Connelly,* 479 U.S. 157, 170 (1986)).

Though a defendant's mental status is "relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly,* 479 U.S. 157, 164 (1986). If officers do not "exploit[] [a defendant's] weakness with coercive tactics," then there is no basis to find that a defendant's confession was involuntary. *Connelly,* 479 U.S. at 165. In determining whether police engaged in coercive conduct, a district court must consider the totality of the circumstances. A court should consider, for example, whether the police "applied physical force or threatened to do so," promised a reward to induce a defendant's statement, or subjected a defendant "to interrogation of exhaustingly long duration." *Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988).

Mr. Nelson relies on *Townsend v. Sain*, 372 U.S. 293 (1963), for the proposition that "'any questioning by police officers which in fact produces a confession which is not the product of a free intellect renders that confession inadmissible.'" (Doc. 40, p. 2) (quoting *Townsend*, 372 U.S. at 308). Mr. Nelson implicitly argues that a finding of police coercion is not necessary for a court to find that his statements were involuntary based solely on his alcohol and marijuana impairment. (Doc. 35, pp. 41, 73). The United States argues that Mr. Nelson's

reliance on *Townsend* is misplaced and that the Supreme Court's holding in *Connelly* forecloses Mr. Nelson's argument.  (Doc. 37, pp. 15-19).

In *Connelly*, when the defendant approached a police officer and confessed to a murder, the officer immediately advised Mr. Connelly of his *Miranda* rights. *Connelly*, 479 U.S. at 160.  Mr. Connelly said he understood his rights but wanted to talk about the murder.  *Connelly*, 479 U.S. at 160.  Mr. Connelly stated that he had been a patient in "several mental hospitals."  *Connelly*, 479 U.S. at 160.  The officer again advised Mr. Connelly that he was under no obligation to talk.  *Connelly*, 479 U.S. at 160.  The officer indicated that Mr. Connelly "appeared to understand fully the nature of his act."  *Connelly*, 479 U.S. at 160.  A homicide detective read Mr. Connelly his *Miranda* rights and interviewed him; Mr. Connelly again confessed to murder.  *Connelly*, 479 U.S. at 160.  The detective did not know that Mr. Connelly suffered from a mental illness.  *Connelly*, 479 U.S. at 161.

Mr. Connelly was charged with murder, found incompetent to stand trial, and later found competent to proceed to trial.  *Connelly*, 479 U.S. at 161.  Mr. Connelly filed a motion to suppress.  At a hearing on the motion, an expert testified that Mr. Connelly suffered from schizophrenia and experienced "command hallucinations" that affected his "ability to make free and rational choices" when he confessed to murder.  *Connelly*, 479 U.S. at 161.  Relying on *Townsend*, a state trial court found that the police had not coerced Mr. Connelly's confession, but the trial court

21

suppressed Mr. Connelly's statements because his "illness destroyed his volition and compelled him to confess." *Connelly*, 479 U.S. at 162.  The state supreme court affirmed the trial court's decision. *Connelly*, 479 U.S. at 162.

The United States Supreme Court reversed and distinguished *Townsend* because *Townsend* involved "police wrongdoing." *Connelly*, 479 U.S. at 165.  The Supreme Court explained that in *Townsend*, a "police physician had given [Mr.] Townsend a drug with truth-serum properties" and that the officers who obtained Mr. Townsend's confession "knew that Townsend had been given drugs." *Connelly*, 479 U.S. at 165.  The Supreme Court stated that *Townsend* "demonstrates that while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry;" police coercion is required for a confession to be involuntary. *Connelly*, 479 U.S. at 165.

Here, the record does not contain evidence that Agent Smith or another law enforcement officer coerced Mr. Nelson to speak.  Mr. Nelson did not testify that the agents brandished their weapons, spoke harshly, threatened physical force, made promises in return for a confession, or interviewed him for a long time.  Agent Smith asked to enter Mr. Nelson's house, and Mr. Nelson agreed.  Mr. Nelson testified that he did not tell the agents that he was intoxicated, and the agents testified that they did not see signs that Mr. Nelson was impaired.  Mr. Nelson presented no evidence

that agents were aware of his intoxication and exploited his condition with coercive tactics.  Mr. Tewalt testified that one of the reasons he decided not to file a motion to suppress was that there was no evidence that agents coerced Mr. Nelson's confession.  (Doc. 35, pp. 44, 46).

Moreover, a defendant's alcohol impairment "does not affect the voluntariness of his confession unless it undermines his ability to comprehend in a general way what he is doing and to communicate with coherence and context." *Arvelo*, 687 Fed. Appx. at 906.  Mr. Nelson testified that he was not "staggering drunk."  (Doc. 35, pp. 11, 15).  Mr. Nelson understood his situation well enough to discuss with Agent Smith the location of hidden cameras and other equipment and to ask other officers to leave so that he could speak only with Agent Smith.  (Doc. 35, pp. 63-65).  Agent Smith testified that Mr. Nelson clearly explained things during the interview.  (Doc. 35, p. 64).  Mr. Nelson admitted that he was not so impaired that he could not write a statement.  (Doc. 35, pp. 19-20).  Mr. Nelson's handwritten, detailed confession describing his criminal conduct demonstrates that he could communicate clearly.  (Doc. 36-1, pp. 3-4).

Thus, even accepting Mr. Nelson's version of events, a court would not have a sufficient basis to conclude that Mr. Nelson's level of intoxication was so great as to undermine the voluntariness of his statements or written confession.  Mr. Tewalt discussed with Mr. Nelson his level of impairment, and Mr. Nelson stated he was a

"high functioning alcoholic." (Doc. 35, pp. 40, 44). Mr. Tewalt discussed with Mr. Nelson the "existing case law about impairment," and he and Mr. Nelson jointly decided not to file a motion to suppress. (Doc. 35, pp. 40-42). Therefore, Mr. Nelson has not established that Mr. Tewalt's decision not to file a motion to suppress was outside the range of strategic decisions that a reasonable lawyer might make under the circumstances of this case.

Mr. Nelson signed a second *Miranda* waiver before Agent Salser interview him at the jail. (Doc. 35, pp. 9-10, 66-67; *see* Doc. 40, p. 5 (Mr. Nelson's post-hearing brief in which he acknowledges that he "willfully waiv[ed] his *Miranda* rights" concerning the second interview)). Mr. Nelson concedes that he was sober by the time of this second interview, and he does not contend that his second *Miranda* waiver was involuntary. (Doc. 35, p. 10). Mr. Nelson argues that "what the Government gleaned from the afternoon interrogation resulted from [Mr. Nelson's] altered mental state confession in the morning" and "allowed the Government to confirm [] what [Mr. Nelson] previously confessed." (Doc. 40, p. 5). Mr. Nelson asserts that because his statements to Agent Smith and his written confession were involuntary, the evidence obtained during the second interrogation was fruit of the poisonous tree that should be suppressed. (Doc. 40, p. 5). For the reasons discussed, Mr. Nelson's statements to Agent Smith and written confession during the first interview were non-custodial, voluntary, and not the result of police

coercion.  Mr. Nelson provides no other ground to suppress his statements during the second interrogation.  If Mr. Tewalt had filed a motion to suppress, Mr. Nelson's argument that the information from the second interrogation was tainted by the involuntariness of his statements and confession during the first interview would likely fail.  Mr. Tewalt reasonably decided not to file a motion to suppress on this issue.

As part of his trial strategy, Mr. Tewalt testified that he wanted Mr. Nelson to enter a guilty plea quickly to prevent the government from discovering damaging evidence concerning sexual abuse.  (Doc. 35, p. 51).  Mr. Tewalt's decision not to file a motion to suppress likely prevented an evidentiary hearing at which damaging evidence concerning sexual assault of Mr. Nelson's autistic niece could have surfaced.  Mr. Tewalt testified that he developed his strategy after talking with other attorneys in his office, reading the applicable law, and assessing the facts in Mr. Nelson's case.  "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."  *Strickland*, 466 U.S. at 690.  Mr. Tewalt's strategy not to file a motion to suppress was reasonable given the totality of the facts and circumstances of this case.

## IV.

Based on the record before the Court, Mr. Nelson has not demonstrated that no reasonable attorney would have decided not to file a motion to suppress in this

case.  Mr. Tewalt's decision not to file a motion to suppress was within the range of professionally competent representation.  Because a suppression motion was not likely to succeed under the law that applies to the record in this case, Mr. Nelson cannot show a "reasonable probability" that the outcome of his criminal case would have been different had Mr. Tewalt filed a motion to suppress.  Here, Mr. Nelson has not met his burden under either prong of the *Strickland* test.  Accordingly, by separate order, the Court will deny Mr. Nelson's § 2255 motion and close this matter.

**DONE** and **ORDERED** this September 30, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE